**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, B. Reese McIntyre, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an electronic device that is currently in law-enforcement possession, and the extraction of information electronically stored on that device as described in Attachment B.

2. I am a Special Agent with the FBI, and have been since May 23, 2019. I graduated from the FBI Academy located aboard Marine Corps Base, Quantico, Virginia, and am currently assigned to the Lansing Resident Agency of FBI Detroit Division. Before that, I was police officer for the Metro Nashville Police Department in Nashville, Tennessee, for approximately 4½ years. My duties as an FBI Special Agent include investigating Hobbs Act robberies and related federal felonies.

3. This continuation is based on information I personally obtained, as well as information I received from law enforcement officers and agents who participated in this investigation. This continuation does not contain all the information known as a result of this investigation, but only those facts that I believe are necessary to establish probable cause for the search warrant sought.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4. The property to be searched is a TracFone Alcatel Raven Cellular Phone, Model A574BL, black in color, IMEI number 015295000054212, hereinafter the "**Device**." The **Device** is currently located at the Lansing Resident Agency of the Federal Bureau of Investigation.

5. The applied-for warrant would authorize the forensic examination of the **Device**, described above and in **Attachment A**, for the purpose of identifying, examining, copying, and seizing the records and information described in **Attachment B**.

**PROBABLE CAUSE**

6. Based on my training and experience, and the facts set forth and incorporated in this continuation, there is probable cause to believe that James Winston Honeysucker, Jr., a/k/a "Ace," a/k/a "Ace Sohood," a/k/a "Ace Sohood Pffp" ("HONEYSUCKER"), in the Western District of Michigan, committed crimes that include violations of 18 U.S.C. § 1951 [interference with commerce by robbery] and 18 U.S.C. § 924(c)(1)(A)(ii) [possession and brandishing of a firearm in furtherance of a crime of violence], and that the information described in **Attachment B** will constitute evidence of these criminal violations. Based on that probable cause, on January 28, 2020, a grand jury issued a superseding indictment charging HONEYSUCKER with violating 18 U.S.C. § 1951 on August 12, September 14, September 30, and October 22, 2019, and violating

18 U.S.C. § 924(c)(1)(A)(ii) on September 14, September 30, and October 22, 2019. As detailed below, I believe that information on the **Device** could provide further evidence supporting these charges, and may reveal additional crimes committed by HONEYSUCKER.

7. Together with state and local law enforcement agencies, I am investigating a series of armed robberies that occurred in the Western District of Michigan. During the investigation, I applied for and obtained a search warrant in Case No. 1:19-mj-413 to obtain information from T-Mobile USA, Inc., regarding robberies for which I believe there is probable cause that HONEYSUCKER committed. I reviewed the results of that search warrant[1] and, based on my training and experience, determined that devices associated with phone numbers connected to HONEYSUCKER were present near the robberies described in the materials incorporated by reference below that occurred on September 14, September 30, and October 22, 2019, at the same approximate time those robberies occurred.

8. The application for the search warrant that was issued in Case No. 1:19-mj-413 is attached as Attachment C, and includes a continuation (the "Prior Continuation") with a statement of probable cause in paragraphs 5 to 41. To summarize and highlight key portions of paragraphs 5 to 41 of the Prior Continuation: those paragraphs set forth facts that I believe establish probable cause that HONEYSUCKER committed multiple armed robberies of cash advance businesses in and around Battle Creek and Lansing, Michigan, from May 2019 through October 2019. Video evidence indicates that the perpetrator of multiple robberies was using a cellphone during the robberies. Following the October 22, 2019 robbery of a Check 'n Go cash advance business located in Battle Creek, Wilnell Lakeey Henry ("HENRY") admitted driving HONEYSUCKER from the scene of the robbery to a bus station in Kalamazoo, Michigan. HENRY also told law enforcement that HONEYSUCKER was using a device associated with the following phone number: 517-505-5127. Police sent an emergency ping to that phone number, which indicated that an associated device was located at a bus station in Chicago, Illinois. Police found HONEYSUCKER at the bus station and arrested him. Police found in HONEYSUCKER's possession the phone I now seek a warrant to examine, along with approximately $17,000 cash and a pistol that matched a description of the pistol that was used during the October 22, 2019 robbery. The "Target Cellphone"

---

[1] The only cellphone network provider records obtained through search warrants that federal agents substantively reviewed and analyzed in this case were produced by T-Mobile USA, Inc., in response to federal search warrants issued in Case Nos. 1:19-mj-413 (regarding Honeysucker's suspected phone numbers ending in 5127 and 5585) and 1:19-mj-464 (regarding Henry's suspected phone numbers ending in 4059 and 2791). Before federal agents executed those warrants, the Lansing Police Department executed a search warrant on T-Mobile for information related to Honeysucker's phone number ending in 5585, and the Battle Creek Police Department executed search warrants on T-Mobile for Honeysucker's phone number ending in 5585, and on AT&T for information related to Honeysucker's phone number ending in 5127. Federal agents did not analyze or rely on the materials T-Mobile and AT&T produced in response to the Lansing and Battle Creek warrants. Federal agents instead conducted only a cursory review to confirm the general category of information contained in T-Mobile's and AT&T's responses.

referenced in paragraph 13 of the Prior Continuation is the same object as the **Device**, defined above.

9. To summarize paragraphs 10–11 of the Prior Continuation in particular: HENRY initially told police that he was not involved in planning the October 22, 2019 robbery, and that he was not intentionally involved in executing it. Instead, HENRY told police that he gave HONEYSUCKER a ride at HONEYSUCKER's request; later picked him up at his request; and after picking HONEYSUCKER up, was told by HONEYSUCKER that he had "hit a lick." HENRY told police that HONEYSUCKER gave him a "large wad of money," and that HENRY then drove HONEYSUCKER to a bus station in Kalamazoo.

10. The same statement of probable cause contained in paragraphs 5 to 41 of the Prior Continuation supports the warrant requested in this application. Accordingly, I now incorporate by reference paragraphs 5 to 41 of the Prior Continuation as though they were fully set forth in this application, subject to the additions and revisions set forth herein, and in particular in paragraphs 11 to 15, below.

11. I interviewed HENRY in December 2019 and January 2020.

   a. During the December 2019 interview, HENRY told me a story that was similar to what he initially told police as summarized above in paragraph 9, though with a few differences. In particular, HENRY told me that HONEYSUCKER claimed to have "hit a lick," not in HENRY's truck, but on the phone when HONEYSUCKER called to ask for a second ride.

   b. During the January 2020 interview, HENRY stated that he knowingly and intentionally drove HONEYSUCKER to and from robberies of cash advance businesses on October 22, 2019; October 17, 2019; September 30, 2019; and September 14, 2019. HENRY also stated that he and HONEYSUCKER were in phone contact during each of the robberies.

12. The Check 'n Go referenced in paragraph 7 of the Prior Continuation performed an updated calculation of their loss from the October 22 robbery. According to Check 'n Go, its approximate loss was $41,572.88.

13. After HONEYSUCKER's arrest in Chicago, the **Device** was in the custody of Chicago law enforcement. The **Device** was later transferred to the custody of the FBI. The **Device** is currently in storage at the FBI Lansing Resident Agency. Based on my training and experience, I believe the **Device** has been stored and transferred in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Device** first came into the possession of Chicago law enforcement.

14. In the Prior Continuation, and especially paragraphs 32–34 and 39–41, I stated facts to establish probable cause that HONEYSUCKER robbed an Instant Cash business located in

Lansing, Michigan, in separate robberies that occurred on May 18, 2019 and October 17, 2019. To those statements, I add the following:

    a. On or about March 16, 2020, I received body-cam video recorded by an officer who responded to the October 17 robbery. I reviewed the video, which shows that, at one point, the two employees who were present during the October 17 robbery stated their belief that the May 18 and October 17 robberies were committed by different people. According to police reports, only one of those employees was present for both robberies. I also re-reviewed police reports about the October 17 robbery, one of which memorializes that the employee who was present during both robberies believes they were committed by different people.

    b. As noted above, during my January 2020 interview of HENRY, he stated that he and HONEYSUCKER robbed the Instant Cash on October 17, 2019. According to HENRY, HONEYSUCKER said that he believed one of the Instant Cash employees recognized him. HENRY also said that he and HONEYSUCKER were on the phone during the October 17 robbery. Phone records do not indicate they were on the phone during that robbery, but do indicate that, minutes after the robbery, HONEYSUCKER made a cellphone call to his girlfriend using a cell tower in the immediate area of the robbery.

    c. The Superseding Indictment against HONEYSUCKER and HENRY (Case No. 1:19-cr-292) does not charge them with robbing the Instant Cash on May 18 or October 17, 2019. The investigation into those robberies continues.

15. Based on my training and experience, I understand that:

    a. criminals, including robbers, often use cellular phones to facilitate crimes, including to communicate with co-conspirators and accomplices before, after, and during the commission of robberies, and to research and plan robberies;

    b. people, including robbers, often use cellular phones to create and maintain lists of contacts, including criminal associates;

    c. robbers routinely keep their cellular phones in their possession;

    d. evidence that a person committed a crime is often created, sent, received, or saved months before the crime is actually committed, including (i) evidence of relationships with others involved in the crime, (ii) evidence of plans or preparations to commit the crime, or of whether a person possessed tools or instruments used during the crime, and (iii) evidence of a person's motive, knowledge, skill, or intent to commit the crime;

e. cellular phones often contain evidence that indicates whether the phone's owner or possessor was involved in committing robberies, including records of incoming and outgoing calls and text messages with co-conspirators and accomplices; voicemail messages; photographs or videos of robbery targets, coconspirators, or currency; and records indicating the location of the device at certain times, providing evidence that the device was at or near the scene of a robbery when the robbery was committed, or evidencing the route used to get to and from a robbery;

f. cellular phones often permit users to access social media platforms like Facebook, Instagram, and Twitter, and robbers frequently use social media platforms to communicate with co-conspirators and accomplices, or to describe or publish photographs of fruits of their crimes, such tools or currency;

g. robbers often photograph, video record, or purchase the tools of their trade, like firearms, and use their cellular phones to access illicit marketplaces or recruit others with pictures or videos of firearms in order to plan their robberies;

h. robbers often use their cellular phones to create and save photos and videos in the course of planning or documenting robberies;

i. people, including robbers, often use cellular phones to create and maintain their schedules, including by using calendars, task lists, word processing applications, or other software, or through communications with others;

j. people, including robbers, often use cellular phones to conduct financial transactions, including to deposit, spend, or otherwise use money, which may include the proceeds of robberies, and as a result, cellular phones often contain (or permit access to) bank records, check images, credit card information, account information, and similar financial information that may evidence the possession of robbery proceeds;

k. people, including robbers, often use cellular phones to access the Internet, and robbers often use the Internet to plan and execute robberies, including by researching potential targets or communicating with accomplices; and

l. accessing the Internet using a cellular phone requires using an Internet Protocol address that is, in some cases, able to reveal (either alone or in conjunction with other information) who accessed the Internet and/or the location from which they accessed it.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

16.     The requested warrant would authorize extraction and copying of electronically stored information, under Rule 41(e)(2)(B), for the purpose of locating and seizing records and information.

17.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available at https://tracfoneusermanual.net/wp-content/uploads/2018/02/Alcatel-Raven-User-Manual.pdf, I believe the **Device** is capable of creating and storing records and information consistent with the records and information described in paragraph 14, above, for long periods of time.

18.     *Forensic evidence.* This application seeks permission to locate forensic electronic evidence that establishes how the **Device** was used, the purpose of the use, who used it, and when, in order to determine the use of the **Device** as a tool to facilitate the commission of robbery. This application also seeks other forensic electronic evidence of the crimes under investigation, including communications, photos, videos, contact information, and location information, along with evidence that will help identify the **Device**'s primary user(s) and owner(s). I believe there is probable cause that such forensic electronic evidence may be on the **Device** because, based on my training and experience, I understand that:

   a. records and information on electronic devices can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file, or a portion of a recorded video);

   b. forensic evidence on a device can also indicate who has used or controlled the device, and this "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence;

   c. a person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when; and

   d. the process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

19. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

20. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

21. Based on the above factual information, I respectfully submit that there is probable cause to believe that evidence and instrumentalities of criminal offences in violation of violations of 18 U.S.C. § 1951 [interference with commerce by robbery] and 18 U.S.C. § 924(c)(1)(A)(ii) [possession and brandishing of a firearm in furtherance of a crime of violence] may be found in the locations described in **Attachment A**.

22. I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in **Attachment B**.